```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

UNITED STATES

                                                    **MEMORANDUM AND ORDER**

    -against-
                                                    13-CR-164 (KAM)
STEPHANNIE BROUGHTON,

                    Defendant.

----------------------------------------X
```
**MATSUMOTO, United States District Judge:**

  Defendant Stephannie Broughton ("defendant" or "Broughton") is charged with conspiracy to import cocaine, importation of cocaine, conspiracy to possess cocaine with intent to distribute, and possession of cocaine with intent to distribute. (ECF No. 13, Indictment.) Broughton was charged with co-defendant Rorianne Prawl ("Prawl"), who subsequently pled guilty to Count One of the Indictment, conspiracy to import cocaine. (ECF No. 22.) Broughton now moves pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress statements she made on the date of her arrest, February 14, 2013, to United States Customs and Border Protection ("CBP") officers and Homeland Security Investigations ("HSI") agents at John F. Kennedy Airport ("JFK").

  The court held a suppression hearing on September 5, 2013, at which the government presented two witnesses, CBP Officer Christopher Aronica ("Officer Aronica") and Special

Agent Derek Bergman of HSI, and the defendant presented one, Special Agent Daniel Reed, also of HSI. (*See generally* Transcript of Suppression Hearing ("Tr.").) Having considered the testimony of these witnesses and the parties' written submissions, including the defendant's declaration dated August 15, 2013, the court denies the motion to suppress.

## I. FINDINGS OF FACT

The testimony at the suppression hearing presented a credible and largely consistent account about the circumstances surrounding Broughton's arrest and questioning at JFK. As such, the court makes the following findings of fact based on that testimony. *See* Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").

### A. Officer Aronica's Testimony

Officer Aronica, whose testimony the court finds credible, testified that he has been a CBP Officer for approximately eight years and currently works in the Passenger Enforcement Roving Team ("PERT") or Counter Terrorism Roving Response Team ("CTRRT"). (Tr. at 4-5.) Part of his role on these teams is to examine randomly selected passengers and their luggage entering the United States. (Tr. at 10.) On February 14, 2013, while working in Terminal 4 at JFK, Officer Aronica selected Broughton for a random screening prior to her

2

approaching the customs checkpoint. (Tr. at 6-7.) He then asked Broughton several questions about the responses on her customs declaration form; in response to one of these questions, Broughton stated that all items in the two pieces of luggage were hers and that she had packed the bags herself. (Tr. at 9.)

Officer Aronica next examined Broughton's luggage in a public area. (Tr. at 7-9.) At this time, Broughton was not restrained. (Tr. at 10.) During the examination, Officer Aronica located a shoe in Broughton's luggage that he believed to be unusually heavy. (Tr. at 11.) Upon probing the shoe, he noticed a "white powdery substance" inside the shoe. (Tr. at 11.)

Following the discovery of the white substance, Officer Aronica and Broughton moved to a private examination area, a ten foot by ten foot room, with one door, no windows, a desk, chair and bench. (Tr. at 12, 23-24.) There, Broughton was patted down by two female officers while Officer Aronica waited outside. (Tr. at 12.) Officer Aronica's notes record that the patdown occurred at 11:35 AM. (Tr. at 14.) After the patdown search, at 11:38 AM, Officer Aronica field tested the substance found in the shoe, and determined that it was cocaine. (Tr. at 12-14.) Officer Aronica informed Broughton that she was under arrest and handcuffed her at 11:39 AM. (Tr. at 13-14.) A further search of Broughton's luggage revealed three other shoes

3

containing cocaine. (Tr. at 15.)

According to Officer Aronica, Broughton made several statements while her bags were being examined in the private examination area: first, that the shoes did not belong to her; second, that the shoes belonged to a friend with whom she was travelling; and, third, that her friend might have had "some kind of connection with drugs and shoes." (Tr. at 15-16.) Officer Aronica could not recall whether the first two statements by Broughton were made pre- or post-arrest, but he testified that the third statement regarding her friend's connection to drugs and shoes was made after Broughton's arrest. (Tr. at 15-16, 27-28.) He also could not recall asking any questions that prompted Broughton's statements but testified that he did not ask Broughton whether "she had any involvement with the importation of drugs;" whether "she had imported drugs before;" "how [the] shoes came to be placed in her bag;" "if she had any knowledge of what was contained in the shoes in her bag;" "who was supposed to pick up the shoes at the airport;" "if she was made to carry the shoes;" or "for any information on her friend's drug connection." (Tr. at 16-17.) Another officer, whose identity Officer Aronica could not recall, asked Broughton to describe her friend, and Broughton showed the officers a picture of her co-defendant, Prawl, on her cellphone. (Tr. at 17, 32.)

At some point after Broughton's arrest, HSI was notified. (Tr. at 17-18.) Aronica spoke to HSI for "a minute" about the fact that Broughton and Prawl were found with drugs in the shoes they were carrying and had been arrested. (Tr. at 17-18.) He did not believe any other CBP officers gave the HSI agents information that differed from his briefing. (Tr. at 36.) HSI took over the interview from CBP, ending Officer Aronica's interaction with Broughton. (Tr. at 18.)

During her interaction with CBP, Broughton was not advised of her *Miranda* rights. (Tr. at 14.) Officer Aronica testified that CBP officers do not give *Miranda* warnings as a matter of course and that he understood it to be HSI's responsibility to provide *Miranda* rights. (Tr. at 34-35.)

B. <u>Agent Bergman's Testimony</u>

Agent Bergman, whose testimony the court finds credible, testified that he has worked as a special agent for Homeland Security Investigations (HSI) for three years as part of the JFK Narcotics Smuggling Unit (JNSU) team at JFK Airport. (Tr. at 38.) He further testified that his team was notified of defendant's arrest at approximately 11:45 AM on February 14, 2013. (Tr. at 38-39.) After arriving at Terminal 4 around 12:30 PM, Bergman and his two fellow agents were informed that a second individual, Prawl, had been arrested, and received what he described as "a very cursory sort of summary of what had

5

happened [regarding Broughton]. The name of the person, where they were coming from, and the method of concealment." (Tr. at 40.) The CBP officer did not communicate the statements Broughton had previously made in the private search room, including that the shoes did not belong to her, that they had been given to her by a friend, and that Ms. Prawl may have had a drug and shoe connection. (Tr. at 51.)

Bergman's colleague, Special Agent Reed, read Broughton her *Miranda* rights using a card he borrowed from Agent Bergman with the text of the warnings written on it. (Tr. at 42-43; Gov.'s Ex. 1.) Broughton waived her *Miranda* rights. (Tr. at 43.) Bergman and two other agents began speaking to Broughton at approximately 12:45 PM, at which time all CBP officers had left the room. (Tr. at 41-42.) The agents proceeded to speak with Broughton for approximately fifteen minutes in the examination room before leaving her for approximately forty-five minutes. (Tr. 43-44.) The interview resumed at the JNSU team office, also in JFK Terminal 4, with Agent Bergman and Agent Reed present. (Tr. at 44.) The questioning lasted between ninety minutes and two hours, and Agent Bergman described the subjects discussed as Broughton's "previous travel history," "how the shoes came to be in her luggage this time," "[w]hat were her actions the day before her flight," "[w]hat her relationship was with Ms. Prawl." (Tr. at

6

44; *see also* Tr. at 63-65.) At the conclusion of the interview, Broughton was transported to the Metropolitan Detention Center. (Tr. at 45.)

C. <u>Agent Reed's Testimony</u>

Special Agent Daniel Reed, whose testimony the court also found credible, testified regarding questioning the defendant as part of the HSI team. He stated that the briefing HSI agents received from a CBP officer included the information that Broughton had been arrested and that her identification of Ms. Prawl had led to Prawl's arrest, as well. (Tr. at 73-74.) He was also informed that the drugs were found inside a pair of shoes. (Tr. at 74.) CBP officers did not tell him, however, that Broughton had stated that the shoes came from Ms. Prawl, or that Prawl had been identified via a photo on Broughton's cell phone. (Tr. at 79.)

Reed testified that the complaint he swore out in this case inaccurately stated that CBP officers had provided Miranda rights to Broughton. (Tr. at 76; Def. Ex. A.) He indicated that this statement in the complaint was an error because he had given Broughton *Miranda* warnings at the beginning of her HSI interview. (Tr. at 77.)

Finally, Reed indicated that there had been a fifteen to twenty minute break in between the interview in the private examination area and that in the JNSU office, in contrast to

Agent Bergman's testimony regarding a forty-five minute break. (Tr. at 78.)

## II. DISCUSSION

"[O]n a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation." *United States v. Shteyman*, 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011) (citing *United States v. Pena*, 961 F.2d 333, 338 (2d Cir. 1992)). "[O]nce [the defendant] establishes a basis for his motion," however, "the burden rests upon the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers." *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004) (citations omitted).

The Fifth Amendment prohibits compelling a person "in any criminal case to be a witness against himself." U.S. Const. Amend. V. As a result, "the Supreme Court has made clear that the prosecution may not use statements made by a suspect under custodial interrogation unless the suspect (1) has been apprised of his Fifth Amendment rights, and (2) knowingly, intelligently, and voluntarily waives those rights." *United States v. Oehne*, 698 F.3d 119, 122 (2d Cir. 2012) (citing *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966)).

The defendant makes a motion to suppress based on alleged violations of her Fifth Amendment rights. Specifically,

she contends that the statements she made in the private examination area to CBP officers prior to being read her *Miranda* rights were the product of a custodial interrogation and thus should be suppressed, and that the statements she made to HSI agents after receiving her *Miranda* rights were part of a continuous, improper interrogation and should be suppressed as well. The court will examine these contentions in turn.

A. <u>Statements Made to CBP Officers</u>

Broughton does not contend that the statements she made prior to being in the private examination area were unlawfully obtained. As noted above, it is undisputed that the statements Broughton made to CBP officers — including that the shoes containing cocaine found in her luggage were not hers, that they belonged to a friend with whom she was traveling and that her friend, Prawl, had some connection with shoes and drugs — were made in the examination area prior to Broughton being read her *Miranda* rights. The crucial question in evaluating the suppression motion is whether Broughton was subject to custodial interrogation, and thus should have received *Miranda* warnings, during this period.

A law enforcement interaction is custodial when "a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest." *United States v.*

9

*Yilmaz*, 508 Fed. Appx. 49, 51 (2d Cir. 2013) (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)). Courts in this Circuit examine a number of factors in determining whether a person is in custody, including: "the interrogation's duration; its location . . . ; whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion." *FNU LNU*, 653 F.3d at 153 (citing *Yarborough v. Alvarado*, 541 U.S. 652, 661-63, 664-65 (2004)). The fact that Broughton was questioned at the border particularly bears on this analysis:

> [A] reasonable traveler going through customs at an American airport "will expect some constraints as well as questions and follow-up about his or her citizenship, authorization to enter the country, destination, baggage, and so on. That one expects both constraints and questions . . . reduces the likelihood that reasonable persons in that situation would consider themselves to be under arrest.

*United States v. Miller*, 441 Fed. Appx. 804, 806 (2d Cir. 2011) (quoting *FNU LNU*, 653 F.3d at 153-54); *see also United States v. Tavares*, 2012 WL 194974, at *2 (E.D.N.Y. Jan. 23, 2012) (finding the defendant was not in custody when stopped and questioned by a CBP officer because "a [reasonable] person would suppose that the[se] restraints were attendant to the immigration screening process — a process to which all international travelers

entering the United States must submit to one degree or another").

Second, in order to warrant *Miranda* warnings, a law enforcement official must engage in "express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 292 (1980). This questioning involves "a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. That is, "the questions asked must have been both likely to elicit an incriminating response and to produce psychological pressures that will subject the individual to the 'will' of his examiner." *United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) (quoting *United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987), *abrogated on other grounds*). By contrast, "[a]ny statement given freely and voluntarily without any compelling influences is . . . admissible in evidence. . . . Volunteered statements of any kind are not barred by the Fifth Amendment." *United States v. Evans*, 2012 WL 5871611, at *4 (S.D.N.Y. Nov. 12, 2012) (quoting *Miranda*, 440 U.S. at 478).

a. Pre-Arrest Statements

The court finds that, prior to being placed under arrest, the defendant was not in custody.[1] As a result, *Miranda*

---

[1] There is some lack of clarity in the record about whether or not Broughton's statements about the shoes not being hers and instead belonging to a friend were made before or after her arrest; Officer Aronica could not recall the exact timing. (*See* Tr. at 15-16, 27-28.) Broughton's declaration similarly does not make the timing explicit, but, in her largely

11

warnings were not required, and Broughton's statements should not be and are not suppressed. A reasonable person in Broughton's situation would not have believed she was under arrest at this point in her interaction with the CBP officers. Broughton was in the private examination area for a short period — apparently a matter of minutes — before Officer Aronica field tested the powder from her shoes and placed her under arrest. Importantly, the CBP officers were engaged in a routine aspect of border control, examining a suspicious item in her luggage, and Broughton's statements were not made in response to specific questions regarding the circumstances under which the cocaine-laden shoes were found in her luggage. Further, at this point, Broughton was not handcuffed, questioned or otherwise restrained. *See FNU LNU*, 653 F.3d at 155 (finding that the defendant was not under custody where she was interrogated in a closed room for ninety minutes but was not restrained and the questions asked of her related to her admissibility to the country); *see also United States v. Rijo-Carrion*, 2012 WL 6617388, at *3 (E.D.N.Y. Dec. 19, 2012) (holding that the defendant was not in custody because, although he "was asked by a uniformed officer to step out of line into the secondary

---

chronological account, she does discuss making these statements before she mentions being handcuffed. (*See generally* Broughton Decl.) According to Officer Aronica, Broughton was informed she was under arrest just before she was placed in handcuffs. (Tr. at 28.)

screening area and was certainly not free to leave, the restraints to which he was subjected were those attendant to the routine screening of *all* incoming international travelers").

Having found that Broughton was not in custody prior to her arrest, the court need not further address whether her interactions with CBP officers prior to arrest constituted interrogation. Nonetheless, it is worth noting that Broughton appears voluntarily and spontaneously to have made statements regarding her friend's ownership of the shoes and that Broughton traveled from Jamaica with that friend, and that she did not provide this information in response to any specific questions by CBP. Indeed, Officer Aronica testified that he did not question Broughton about either her or Prawl's involvement with drugs. (Tr. at 16-17, 28.) As is discussed further below, even had Broughton been in custody prior to her arrest, her *Miranda* rights would not be implicated by these volunteered statements. *See Miranda*, 440 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment.").

b. Post-Arrest Statements

After Officer Aronica placed Broughton under arrest, he did not provide *Miranda* rights but did continue to search her bag, eventually finding other shoes containing cocaine. (Tr. at 15.) Officer Aronica testified that, at this time, Broughton made at least one other statement: that her friend (Prawl) had a

13

connection to drugs and shoes.[2]  (Tr. at 15-16, 27-28.)

The court finds that the defendant was in custody at the time she made the statement regarding her friend's connection to drugs and shoes.  Broughton had been informed that she was "under arrest for importation of narcotics into the United States" was restrained by handcuffs.  (Tr. at 28.)  A reasonable person would understand herself to be under formal arrest in these circumstances and thus in custody for the purposes of *Miranda*.[3]  *See also FNU LNU*, 653 F.3d at 156 (describing the handcuffing of a suspect in secondary inspection as an "exceptional rather than routine" situation that may implicate *Miranda*); *accord Rijo-Carrion*, 2012 WL 6617388, at *4; *Tavares*, 2012 WL 194974, at *2.

Although Broughton was in custody after CBP officers arrested her, the court finds that she was not subject to interrogation by CBP officers.  Although Officer Aronica did not recall asking any questions of Broughton prior to her statement

---

[2] Neither party discusses Broughton's post-arrest revelation of the password to her phone as a statement that should or should not be suppressed.  (*See* Broughton Decl. ¶ 4 (Broughton's statement that a CBP officer asked her for her phone password and then proceeded to look for a picture of Ms. Prawl); Tr. at 32 (Aronica's testimony that Broughton was either handcuffed or was permitted to take her hand out of the handcuffs to show officers the photo of Prawl).)  Accordingly, the court declines to reach that question here.

[3] The government cites *United States v. Willoughby*, 860 F.3d 15 (2d Cir. 1988) for the proposition that a person placed under arrest may not be in custody within the meaning of *Miranda*.  *Willoughby*, however, involved a prisoner who, while "not free to leave MCC, . . . was free to cut off a conversation with a visitor."  *Id.* at 24.  Broughton's arrest at the airport, after not previously having been in custody, creates a markedly different expectation about whether or not she would have been free to leave.

14

regarding a link between Prawl, drugs and shoes, he testified affirmatively that he did not ask any questions regarding whether Broughton or Prawl were involved with drugs. (*See* Tr. at 16-17, 28.) Volunteered information, as Broughton's statement appears to be, does not implicate *Miranda* even when the speaker is in custody. *See, e.g.*, *Isasi v. Herbert*, 176 Fed. Appx. 143, 144-45 (2d Cir. 2006) (finding, on review of a habeas petition, that the petitioner's "spontaneous" statement was not the result of interrogation, even though he was handcuffed in a police office); *United States v. Mason*, 550 F. Supp. 2d 309, 319 (E.D.N.Y. 2008) (admitting statements made after the defendant's arrest but before he was read his *Miranda* rights because those statements were not in response to interrogation). Broughton's declaration does not assert that the CBP officers asked her any questions regarding drugs that elicited her statements on that subject. Rather, her declaration describes questions related only to identifying Broughton's friend, Prawl, who was still at the airport, according to Broughton's statement to the CBP officers. (Broughton Decl. ¶¶ 4-5.)

Broughton argues that even if the CBP officers did not expressly question Broughton, they did engage in the functional equivalent of interrogation by examining the shoes in front of her. The defendant relies on *People v. Ferro*, 63 N.Y.2d 316 (1984). In *Ferro*, the New York Court of Appeals found that the

15

defendant's *Miranda* rights had been violated where police officers displayed furs stolen from a murder victim in front of the defendant after he had refused to make a statement and requested to speak with the District Attorney. The search of defendant's luggage in this case is readily distinguishable. Officer Aronica merely continued a process of examining Broughton's bag for contraband. This ongoing search is not the type of activity that was "likely to elicit an incriminating response." *Rodriguez*, 356 F.3d at 258.

For the foregoing reasons, defendant's motion to suppress statements made prior to her being given *Miranda* warnings is denied.

B. <u>Statements Made to HSI Agents</u>

Broughton principally argues that the statements she made to HSI agents after she was given *Miranda* warnings should be suppressed because they were part of a continuous interrogation that began with the CBP officers. In general, although "*Miranda* requires that [an] unwarned admission must be suppressed, the admissibility of any subsequent statement . . . [turns] solely on whether it is knowingly and voluntarily made." *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). Law enforcement officials may not, however, "withhold[] *Miranda* warnings until after interrogating and drawing out a confession," in order to have a suspect repeat that confession after being read his

16

rights. *Missouri v. Seibert*, 542 U.S. 600, 609, 617 (2004) (plurality opinion). An impermissible continuous interrogation occurs when law enforcement employs a "deliberate two-step strategy." *United States v. Carter*, 489 F.3d 528, 535 (2d Cir. 2007) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring)) (holding, in line with Justice Kennedy's *Seibert* concurrence, that "*Seibert* lays out an exception to *Elstad*" when this strategy is employed).

In determining whether the early lack of *Miranda* warnings was deliberate, courts examine "the totality of the objective and subjective evidence surrounding the interrogations." *United States v. Williams*, 681 F.3d 35, 41 (2d Cir. 2012) (quoting *United States v. Capers*, 627 F.3d 470, 479 (2d Cir. 2010)). "[I]n reviewing the subjective evidence, closer scrutiny should be given to an investigator's testimony . . . when the proffered rationale is not a legitimate reason to delay or where it inherently lacks credibility." *United States v. Dantzler*, 2013 WL 829204, at *6 (E.D.N.Y. Mar. 6, 2013) (quoting *Williams*, 681 F.3d at 43) (internal quotation marks omitted). In order to evaluate the objective evidence, courts are "guided by" five factors announced by the *Seibert* plurality:

> [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and second, [4] the continuity of police personnel, and [5] the degree to

>        which the interrogator's questions treated the second
>        round as continuous with the first.

*Williams*, 681 F.3d at 40, 44 (quoting *Seibert*, 524 U.S. at 615).

Having examined both the objective and subjective evidence in this case and applying the foregoing *Seibert* factors, the court finds that Broughton was not subject to a deliberate two-step interrogation. There is no subjective evidence in the record that the officers and agents involved in the defendant's interrogation intended to coerce a confession by questioning Broughton in two rounds. Officer Aronica explained that he did not provide *Miranda* warnings to Broughton pursuant to the training given to CBP officers on that subject, not to a two-step interrogation policy, and the court finds his explanation credible. (*See* Tr. at 34-35.)

The objective *Seibert* factors also counsel finding that the two interrogations were distinct. As the defense concedes, the questions the CBP officers posed to Ms. Broughton were limited in scope and duration, and aimed at identifying and locating Ms. Prawl, not at interrogating the defendant about the contraband found in her luggage. (*See* Tr. at 16-17 (Officer Aronica's discussion of the range of questions he and other CBP officers did not ask Broughton).) Relatedly, although Broughton repeated to the HSI agents some of the basic statements she had made to the CBP officers, the range of information she provided

18

to the HSI agents was clearly much more extensive.  For example, Broughton told HSI agents about a possible prior agreement between Broughton and Prawl to bring drugs to the United States, a subject that was neither asked about nor volunteered in the CBP interactions.  (Tr. at 61.)

The setting and personnel involved in each interview were also distinct.  While HSI began questioning Broughton in the private search room, the majority of the HSI interrogation took place in the JNSU team offices.  (Tr. at 44.)  There was also an approximately hour long gap in between the CBP officers' questioning and that by the HSI agents.  (Broughton Decl. ¶ 6.)  HSI agents were not involved in the CBP interview, nor were CBP officers present for any stage of the HSI interrogation.  (Tr. at 41-42, 44.)  Finally, there was a lack of continuity between the two phases of the interview.  HSI received minimal information about what had occurred when CBP was involved and thus did not establish a continuous line of questioning by "look[ing] to earlier statements when eliciting later statements." *United States v. Cohen*, 372 F. Supp. 2d 340, 358 (E.D.N.Y. 2005).  Specifically, both Officer Aronica and Agent Bergman stated that the interactions between CBP and HSI took about "a minute," and Agents Bergman and Reed testified that they were not informed about prior statements Broughton had made regarding receiving the shoes from Prawl or about any link Prawl

may have had to drugs, other than the discovery of drugs in shoes in Broughton's luggage. (Tr. at 18, 29, 40, 51, 79.)

In light of the differences between the two interviews in terms of their extensiveness, their setting and timing, the personnel involved, and subject matter, the court finds that there is little objective evidence to suggest that the officers and agents engaged in a deliberate two-step interrogation. There is similarly no subjective evidence to this effect. For this reason, the motion to suppress Broughton's statements to the HSI agents after she received *Miranda* warnings is denied.

## III. CONCLUSION

For the foregoing reasons, the court denies defendant's motion to suppress in its entirety.

**SO ORDERED.**

Dated:   October 23, 2013
         Brooklyn, New York

                                       _____/s_____
                                       **Kiyo A. Matsumoto**
                                       United States District Judge